FITZPATRICK *v.* MASSEE-FELTON LUMBER CO. *et al.*

No. 12691. MAY 9, 1939.

*James D. Shannon, R. A. Harrison,* and *R. Earl Camp,* for plaintiff.

*Orville A. Park* and *Orville A. Park Jr.,* for defendants.

GRICE, Justice. Irwin Fitzpatrick brought suit against Massee-Felton Lumber Company and Joe Brown. The first count was for trespass, for cutting timber, with a prayer for damages. The second count was based on allegations appropriate to relief by injunction against the cutting of timber. The land involved consisted of lots 293, 294, 295, and 296 in the 24th district of Twiggs County. Brown was a nominal party, and filed no defense. The other defendant answered, averring ownership in itself of the four lots of land, and denying that the plaintiff had any title thereto. The case was referred to an auditor, who reported three findings of fact, to wit: first, that Massee-Felton Lumber Company holds the true title to the lands, and that Fitzpatrick has no valid paper title to the same; second, that Fitzpatrick has no prescriptive title thereto; third, that the timber cut on those lots by the defendants was their property, and that any other timber cut off of other lands is not involved in this action. The final conclusion, treated by the parties as a finding of law, was that the plaintiff was not en-

titled to the relief prayed for, and that Massee-Felton Lumber Company holds the true title to the lands in question, and is entitled to a decree in its favor. To each of the findings the plaintiff filed exceptions, all of which were overruled, and a decree was entered in accordance with the findings of the auditor. The plaintiff excepted.

■ The only assignments of error deal with the refusal of the judge to approve the exceptions to the report of the auditor, and to the final judgment. The finding of law naturally followed the findings of fact. If the exceptions of fact are not sustained, the exception to the finding of law is not well taken, and vice versa. As expressed by counsel for the plaintiff in their brief, "the exceptions of law are naturally incident and consequent upon there being no basis of support in the evidence for the auditor's findings." Therefore we shall deal specifically only with the findings of fact and the exceptions thereto. In an equity case the losing party can not, as a matter of right, have a jury pass upon exceptions to the findings of fact by an auditor. In such case, if the judge approves an exception of fact, the issue is referred to a jury; but if he refuses to approve an exception of fact, his ruling will not be disturbed unless there be no evidence to support the finding. Therefore we are only to determine, from an examination of the record, whether the findings were without evidence to support them, and contrary to all the evidence in the case. *Lamar* v. *Allen,* 108 *Ga.* 158 (33 S. E. 958) ; *Fowler* v. *Davis,* 120 *Ga.* 442 (2) (47 S. E. 951) ; *Orr* v. *Cooledge,* 125 *Ga.* 496 (3) (54 S. E. 618) ; *Faucett* v. *Rogers,* 152 *Ga.* 168 (108 S. E. 798) ; *Crim* v. *Alston,* 169 *Ga.* 852 (151 S. E. 807) ; *DeLaPerriere* v. *Williams,* 175 *Ga.* 339 (165 S. E. 214) ; *Bradley* v. *DeLoach,* 176 *Ga.* 142 (167 S. E. 301).

■ In finding of fact number 1 the auditor finds "that [a] the Massee-Felton Lumber Co. holds the true title to the land in question, by written evidence of title; and [b] that Irwin Fitzpatrick has no valid paper title to the same." We shall for the moment consider the latter part of the conclusion, to wit, that Fitzpatrick has no valid paper title. In the light of the contentions of the parties as made by the pleadings, the evidence, and the briefs, we take it that the meaning of this finding is that Fitzpatrick did not connect himself with the true paper title to these lots, nor did he produce a conveyance from one shown to have had title. It is not

claimed that Fitzpatrick showed title from the State. His earliest muniment of title is a deed to secure debt from Annie P. Tarver to New England Mortgage Security Company of Connecticut, dated August 13, 1882, conveying 16,364 acres, more or less. Only an abstract of the deed appears. It purported to convey the Tarver home place in the 24th district of Twiggs County, composed of certain named lots; the Houston place comprising certain designated lots; the Bunn Mill place comprising certain named lots; twenty-four other separate lots not embraced within any general description; and "the Jordan place consisting of lots or parts of lots as follows: 236, 239, 240, 265, 266, 267, 268, 293, 294, 295, 296, lying east of the Ocmulgee river." No county or land district is indicated, and no general description or name given to the entire property included in this deed. Under former rulings of this court, the deed did not embrace one tract, but several tracts. *Barber* v. *Shaffer,* 76 *Ga.* 285; *Durham Coal & Coke Co.* v. *Wingfield,* 142 *Ga.* 725 (83 S. E. 683); *Georgia Minerals Co.* v. *Cox,* 154 *Ga.* 861 (115 S. E. 770). There is no evidence to show that these lands are even contiguous, nor can we, as to that, call to our aid any judicial cognizance (compare *Osteen* v. *Wynn,* 131 *Ga.* 209, 212, 62 S. E. 37, 127 Am. St. R. 212; *Payton* v. *McPhaul,* 128 *Ga.* 510, 514, 58 S. E. 50, 11 Ann. Cas. 163; *Hatton* v. *Johnson,* 157 *Ga.* 313, 325, 121 S. E. 404); for the district number is not given as to the location of the lots comprising the Houston place, the Bunn Mill place, or the Jordan place. The four lots of land here involved are mentioned but once in this deed, and then only as a part of the Jordan place. It is not shown that Mrs. Tarver was ever in possession of any of these lands. Besides, while a United States marshal's deed is in the record, giving exactly the same description as in the deed first mentioned, and indicating that the last-named deed was based on a fi. fa. as the result of a suit of the New England Mortgage Security Company against Mrs. Tarver, no fi. fa. accompanied the deed, nor was proof made of any judgment. The marshal's deed, standing alone, did not show title out of Mrs. Tarver, even if title had been shown into her. Powell's Actions for Land, § 224, and cit. But the deed without more would serve as color of title. *Beverly* v. *Burke,* 9 *Ga.* 440 (54 Am. D. 351); *Burkhalter* v. *Edwards,* 16 *Ga.* 593 (2) (60 Am. D. 744); *Hester* v. *Coats,* 22 *Ga.* 56, 58; *Sutton* v. *McLoud,* 26

*Ga.* 638 (2) ; *Hammond* v. *Crosby,* 68 *Ga.* 767; *Wade* v. *Garrett,* 109 *Ga.* 270 (34 S. E. 572).

A writing capable of serving merely as color of title can not transmit title, and is useless in proving title except as it illustrates the character and extent of possession. Fitzpatrick, however, testified that "In 1895, deputy United States marshal put me in possession of all that tract of land, and I have never been out of possession. He put me in as agent for the New England Mortgage Security Company." In explanation of the above, he swore in answer to questions by the auditor as follows: "Q. Have you ever lived on the Tarver place? A. I am living on it now. Q. That was on lot 181 on this map put down as 'Tarversville'? A. Yes, sir. Q. When did you move to lot 181? A. I was put in possession of it in 1895, and moved there that June or the next June, and have been on that lot ever since. I have had the same ownership over all that Tarver stuff. Q. Is that the time the marshal put you in possession? A. Yes, sir. Q. Just what did the marshal do when he came down that time? A. He had the U. S. marshal Lucius M. Lamar deed that he made Flint, and read off every one of the lots, and notified me that he was coming a certain day and for all tenants on the plantation to be there, and he read off all of the lots and told every one of them that I was agent for the New England Mortgage Security Company and to hold under me because they had had so much trouble with Mr. Tarver."

Whose tenants were there? On which of the several tracts named in the marshal's deed did they live? This far from supports his statement on his direct examination that he was put in possession of all these lands in 1895, and has been in possession of them continuously ever since. And that is all the testimony there was to show it, except what he claims as actual possession of the four particular lots involved, and his actual possession of lot 181. As to this lot, he swore he was put in possession of it in 1895, moved there that June or the next June, and had been on it ever since. Lot 181, according to the deed, is a part of the tract known as Tarver home place. Under the authorities heretofore referred to, his actual residence there could not give him constructive possession of lots 293, 294, 295, and 296, which were a part of another distinct tract. "A residence upon, and the actual possession and occupation of one of two tracts of land conveyed to the defendant

in the same deed, is not such a constructive possession of the other tract of which there is no actual occupation as, if continued long enough, will bar an action by the rightful owner under the statute of limitations." *Grimes* v. *Ragland,* 28 *Ga.* 123. He claims title to the last-named lots under successive conveyances beginning with the marshal's deed. But none of them shows title to the lots involved. It ought to need no citation of authority to support the statement that merely exhibiting a number of deeds from one person into another, and finally into the plaintiff, no matter how many years they cover, does not show title. The auditor's finding that Fitzpatrick had no paper title to the lands was supported by the evidence. It was not erroneous to disapprove the exception.

The second finding of fact by the auditor was that Fitzpatrick had no prescriptive title to those lands. He based this on the further finding that there was no actual possession of these lots in him. What is title by prescription? "Title by prescription is the right to property which a possessor acquires by reason of the continuance of his possession for a period of time fixed by the laws." Code, § 85-401. What are the essentials of a prescriptive title? Actual adverse possession of lands for twenty years, by itself, shall give good title by prescription. § 85-406. Adverse possession of land under written evidence of title, which means color of title, for seven years shall give a like title by prescription. Possession is of two kinds, actual and constructive. "Actual possession of lands is evidenced by inclosure, cultivation, or any use and occupation thereof which is so notorious as to attract the attention of every adverse claimant, and so exclusive as to prevent actual occupation by another." Code, § 85-403. "Constructive possession of lands exists where one having paper title to a tract of land is in actual possession of only a part thereof. In such a case the law construes the possession to extend to the boundary of the tract." § 85-404. Possession to be the foundation of a prescription must not have originated in fraud. § 85-402. The fraud here referred to is actual or positive fraud. § 85-414. Tested by these principles, we have for determination, not whether there was evidence before the auditor which would have supported a finding in favor of the plaintiff, but whether the evidence was such as demanded a finding in the plaintiff's favor. The four lots here involved were a part of a much larger acreage of swamp land, comprising in all

some thousands of acres, over which for years the cattle and hogs of Fitzpatrick roamed. On still another part of land claimed by him, but some distance away from these particular lots, resided for a time his employee whose duty, in part at least, was to look after these cattle and hogs. At various places on this swamp area Fitzpatrick had posted signs forbidding trespassing. He had from time to time driven hunters away. Whether on any one or more of these three particular lots he had placed non-trespassing signs, or from them had driven hunters, does not appear. Persons desiring to hunt on the swamp lands claimed by him got permission from him to do so. No one or all of these things amounted to actual possession within the meaning of the law declaring that adverse possession of lands, accompanied by written evidence of title for seven years, will ripen into a prescriptive title. Compare *Royall* v. *Lisle,* 15 *Ga.* 545 (60 Am. D. 712) ; *McCook* v. *Crawford,* 114 *Ga.* 337 (40 S. E. 225) ; *Gordon* v. *Ransom & Lomax Lumber Co.,* 147 *Ga.* 55 (92 S. E. 892).

 It is next insisted that the finding of the auditor that Fitzpatrick had no prescriptive title to the four lots can not be sustained, because the evidence shows that in addition to his having since 1895 a chain of deeds purporting to convey the same to him and those under whom he claims, he had them enclosed for more than seven years. The evidence reported by the auditor indicates that a plat was introduced. None, however, appears. But by piecing together various parts of the testimony as they may be gathered from a lengthy record, the situation with respect to this contention is as follows: Of the four lots involved, numbers 295 and 296 have as their western boundary the Ocmulgee river, the latter lying directly south of the former. Lots 294 and 293 are immediately east, respectively, of 295 and 296. All four lie south of Savage creek, north of Crooked creek, and west of the right of way of the Southern Railway. In the main, all the land lying between the two creeks, the railway, and the river is swamp land, subject to overflow, and unfit for actual physical occupancy as well as for cultivation. In 1915 Fitzpatrick built a fence above Savage creek, commencing at the river, and running generally east until it reached nearly to the railroad right of way, where a higher elevation began and where the uplands commenced. The fence above Savage creek was between three and four miles from the lots

in controversy. When the fence struck the railway right of way, it continued in a southerly direction to Crooked creek, crossing that stream in several places. That part of the fence running generally north and south was on lots which lay to the east of lots 295, 296, 294, and 293, but how far away is not shown. When it reached the neighborhood of Crooked creek, the fence ran westward or southwestward toward the river, and its nearest approach to any of the four lots above named was on a lot to the south of them. The fence did not extend to the river, but ended at Graham's lake, a body of water which had no perceptible current, into which, some distance from the nearest of these four lots, Crooked creek emptied, the southwesterly end of the lake meeting the river below the line of these lots. Thus it will be seen that no part of the fence touched any of the four lots, and it does not even appear that Graham's lake, which it is claimed is a natural barrier, touched any of them. The lots were covered with swamp timber, with no visible signs of occupancy or other claim of dominion on any of them, sufficient to "fly the flag" over the land and to put the true owner on notice that his land was held under an adverse claim of ownership.

But it is insisted that these four lots were a part of a large area of swamp land the whole of which was enclosed, and therefore that the plaintiff brings himself within the terms of the Code, § 85-403, which declares that "Actual possession of lands is evidenced by inclosure, cultivation, or any use and occupation thereof which is so notorious as to attract the attention of every adverse claimant, and so exclusive as to prevent actual occupation by another." It is not claimed, of course, that these lots were entirely surrounded by any artificial enclosure, but that, although there was no fence along Graham's lake and the Ocmulgee river, these two bodies of water acted as natural barriers, which together with the fence, the location of which has been heretofore indicated, provided a complete enclosure. In McCrea v. Georgia Power Co., 179 Ga. 1, 14 (174 S. E. 798), it was held that the following request to charge contained a correct principle of law: "To constitute actual possession by inclosure, the land must be completely inclosed; but it is not necessary that it should be completely inclosed, on every side, by artificial means, such as fences. Natural barriers, in part, may be utilized, provided, in connection with fences, they constitute a com-

plete inclosure, which indicates complete and notorious dominion over the land. An inclosure of land, in part by fences, and in part by the high banks of a creek, and in part by a rocky shoal, if all together make a complete inclosure, may constitute actual possession of said land." In support of its ruling this court quoted from 2 C. J. 63, § 16, as follows: "It is not required, however, that the lot should be inclosed on every side by an artificial inclosure; a natural barrier in part may be utilized, provided it be of such a character as, in connection with the fence, will constitute substantial inclosure of the land, and provided it is sufficient to indicate dominion over the premises and to give notoriety to the claim of possession." In that case this court recognized that to constitute an enclosure it is not necessary to have fences surrounding it, provided that a natural barrier *may* be utilized in part, "provided it be of such a character as, in connection with the fence, will constitute a substantial inclosure of the land, *and provided it is sufficient to indicate dominion over the premises and to give notoriety to the claim of possession."* (Italics ours.) In that case high banks and a rocky shoal were involved. Nothing like that appears in the instant case. In the cited case the ruling was that a barrier of the character there dealt with "may be utilized," with a certain proviso; not that it necessarily, as a matter of law, must be held to constitute a part of the enclosure.

It has been argued, that, conceding for the sake of the argument that the river and the lake were natural barriers, still the law would not declare that the four lots here involved were in the actual possession of the plaintiff by virtue of an enclosure, when it is shown that the fence touches none of them, and one side is some miles distant, and that there is nothing about the natural barriers to indicate dominion over this particular land; that God placed the natural barriers there, and it would never occur to any one that they expressed any idea of dominion by man of lands touching them. There is strength in the argument, but we do not find it necessary to decide whether in such a situation even a natural barrier, aided by a fence which does not touch the lands involved, and one side of which is more than three miles distant, could be considered as evidencing actual possession of the lands surrounded, together with other lands, by the fence and the natural barrier. The evidence before the auditor did not demand a finding that Graham's

lake and the Ocmulgee river were both natural barriers, and such as with the fence constituted such a complete enclosure as indicated dominion. Neither the depth nor the width of the river is shown, nor the character of its banks. It does appear from the evidence that hogs had been run across it. As to Graham's lake, the testimony of the witness Blanton, in reply to the question whether it was a body of water sufficient to confine stock in there, replied: "At times it would get so low that a fellow could mighty near go across it." This testimony as to the character of Graham's lake is meager, but the witness Byrum swore that in one place he measured it is approximately 128 feet wide and is shallow, and is not a running stream. The burden was on the plaintiff to show all the elements of the prescriptive title claimed by him. One of them was actual possession for seven years. Since he relied on an enclosure, partly artificial, he could not carry the burden without showing that the lake and river were really such barriers as were contemplated by the ruling in the *McGrea* case, supra. The auditor, under the evidence, was justified in finding this issue against him; and thus it becomes unnecessary to examine the further contentions of the defendant that the fence had not been maintained for the length of time required by the statute, and that the finding of the auditor on the issue of prescription can be justified because of evidence from which a presumption arises that Fitzpatrick's claim was not in good faith.

■ One remaining point needs to be noticed. The auditor made an affirmative finding that the Massee-Felton Lumber Company had title. An exception to this was filed, which was disapproved by the judge. In its answer it set up title, but the plaintiff insists it was not established. Its claim of title originated in a warranty deed from William Bryan to Bennett Jones and Daniel G. Hughes, dated November 16, 1861, the property being described as follows: "lots 241, 264, 269, said lots containing 200-1/2 acres, more or less, also lot No. 293, 120 acres of fractional lots 292, 291, 296, and 297; also 100-1/4 acres, being one half of lot 294; making in the aggregate 1100 acres, more or less. All of the above lots and parcels of land being situate in the 24th land district of Twiggs County, Georgia, and known as the plantation of the said William Bryan, on the Ocmulgee river, adjoining lands of Tarver, Slappey, and others." No possession was shown in

Bryan, or in his grantees, or in any of their successors, except a possession in Massee-Felton Lumber Company, which fell short of the length of time required to ripen into prescription. Its claim of title and proof had the same infirmity as Fitzpatrick's. Neither one showed a holding under any one who ever held title. But the petition of Fitzpatrick showed Massee-Felton Lumber Company to be in possession; and that carries with it the bare presumption, prima facie, that the possessor has title. Besides, the finding and the decree based thereon do not adjudicate that Massee-Felton Lumber Company has the title except as against the claim of the plaintiff. Since the plaintiff failed to show title, it is to him immaterial whether the defendant did or did not. *Vick* v. *Georgia Power Co.*, 178 *Ga.* 869 (4), 877 (174 S. E. 713). No ground for reversal is shown by the ruling of the court in respect to this finding of the auditor.

*Judgment affirmed. All the Justices concur, except*

ATKINSON, Presiding Justice, who concurs in the result, but not in all that is said in the opinion. While the evidence did not demand a finding for the plaintiff on the issue as to boundary and possession as dealt with in the eighth division of the opinion, it would have authorized a finding for him.